Roger A. PETERSON, Petitioner,

v.

R.H. STAFFORD, Washington County Auditor, Joan Anderson Growe, Secretary of State, Respondents.

No. C6–92–1658.

Supreme Court of Minnesota.

Oct. 9, 1992.

Roger A. Peterson, Theresa M. Dosch, Minneapolis, for petitioner.

Jocelyn F. Olson, Asst. Atty. Gen., St. Paul, for Secretary of State.

Richard D. Hodsdon, Washington County Atty.'s Office, Stillwater, for Washington County Auditor.

John E. Grzybek, St. Paul, Minnesota.

Deborah Gilman, Civil Liberties Union, Minneapolis, for amicus curiae Minnesota Civil Liberties Union.

YETKA, Justice.

On September 1, 1992, Roger A. Peterson, a candidate for the office of Associate Justice of the Minnesota Supreme Court, filed a petition pursuant to Minn.Stat. § 204B.44 (1990) invoking the original jurisdiction of the supreme court[1] and seeking a judicial declaration of the unconstitutionality of Minn.Stat. § 204B.36, subds. 4, 5 (1990). This opinion confirms the order filed on September 23, 1992 denying the petition.

On July 15, 1992, petitioner filed an affidavit of candidacy, identifying the office of associate justice now held by Associate

---

1. The Honorable Harold W. Schultz, Retired Judge of the District Court, appointed as acting associate justice pursuant to Minn. Const. art. 6, §§ 2, 10, and Minn.Stat. § 2.724, subds. 1, 2 (1990), and the members of this court who have not exercised their right of recusal have concluded that it is not only appropriate, but necessary in fulfillment of our judicial responsibility to hear and decide this controversy. The circumstances relating to the term of office of each participating justice and the operation of Minn. Stat. §§ 490.121, subd. 12, 490.125 (1990), the mandatory judicial retirement law, make certain the fact that not one member participating in this proceeding will ever stand again for judicial election in the State of Minnesota and that, accordingly, there can be neither the potential for nor the perception of a conflict of interest.

Justice Sandra S. Gardebring as the particular office for which he is a candidate. Minn.Stat. § 204B.06, subd. 6 (1990).[2] The gravamen of this petition, filed 48 days later, is that the form of the ballot used in judicial elections, as defined by Minn.Stat. § 204B.36, subd. 4,[3] and the incumbency designation mandated by Minn.Stat. § 204B.36, subd. 5[4] operate individually and in concert to create an unfair advantage for the judicial incumbent. This advantage, petitioner contends, is not only inconsistent with the letter and spirit of Minn.Stat. § 204B.35, subd. 2,[5] but also is violative of the equal protection clause of the fourteenth amendment of the United States Constitution and Minn. Const. art. 1, § 2.[6]

The petitioner's challenge is to the essence of the traditional judicial election process and, while he is now a candidate for judicial office, the claims asserted have no specific relation to his candidacy. In that context and upon a contention by the respondent secretary of state, we first address the timeliness of the petition.

The very nature of matters implicating election laws and proceedings routinely requires expeditious consideration and disposition by courts facing considerable time constraints imposed by the ballot preparation and distribution process. As a result, we have examined applications for relief not only on their merits, but also from the perspective of whether the applicant acted promptly in initiating proceedings. *See Mattson v. McKenna*, 301 Minn. 103, 222 N.W.2d 273 (1974).[7]

The petitioner claims to have been unaware of the fact that the ballot form would include an incumbency designation until he received his absentee ballot in late August 1992; yet, that designation has appeared on every judicial election ballot on which a sitting judge has sought reelection since 1949.[8] Moreover, issues substantially similar to those raised herein were addressed and decided in 1950 in *Gustafson*

---

**2.** Minn.Stat. § 204B.06, subd. 6 provides in pertinent part:

> An individual who files as a candidate for the office of associate justice of the supreme court * * * shall state in the affidavit of candidacy the office of the particular justice or judge for which the individual is a candidate. The individual shall be a candidate only for the office identified in the affidavit. Each justice of the supreme court * * * is deemed to hold a separate nonpartisan office.

**3.** Minn.Stat. § 204B.36, subd. 4 provides as follows:

> The official ballot shall contain the names of all candidates for each judicial office and shall state the number of those candidates for whom a voter may vote. The title of each judicial office shall be printed on the official primary and general election ballot as follows:
> (a) In the case of the supreme court:
> "Chief justice (or associate justice)—supreme court (last name of incumbent) seat";
> (b) In the case of the court of appeals:
> "Judge—court of appeals (last name of incumbent) seat";
> (c) In the case of the district court:
> "Judge—(number) district court (last name of incumbent) seat"; or
> (d) In the case of the county court:
> "Judge—(number) county court (last name of incumbent) seat."

**4.** Minn.Stat. § 204B.36, subd. 5 provides as follows:

> If a chief justice, associate justice, or judge is a candidate to succeed again, the word "incumbent" shall be printed after that judge's name as a candidate.

**5.** Minn.Stat. § 204B.35, subd. 2 provides as follows:

> Ballots shall be prepared in a manner that enables the voters to understand which questions are to be voted upon and the identity and number of candidates to be voted for in each office and to designate their choices easily and accurately. The name of a candidate shall not appear on a ballot in any way that gives the candidate an advantage over an opponent, including words descriptive of the candidate's occupation, qualifications, principles, or opinions, except as otherwise provided by law.

**6.** Minn. Const. art. 1, § 2 provides as follows: "No member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers."

**7.** *See also Marsh v. Holm*, 238 Minn. 25, 28, 55 N.W.2d 302, 304 (1952); *Moe v. Alsop*, 288 Minn. 323, 331, 180 N.W.2d 255, 260 (1970); *Parsons v. Hickey*, 294 Minn. 537, 539, 201 N.W.2d 150, 152 (1972).

**8.** *See* Minn.Stat. § 205.82 (1950); *Gustafson v. Holm*, 232 Minn. 118, 44 N.W.2d 443 (1950).

*v. Holm,* 232 Minn. 118, 44 N.W.2d 443 (1950). Under those circumstances, we are not persuaded that petitioner, who allowed 48 days to elapse from the time of filing his affidavit of candidacy to the filing of his petition, acted with dispatch in asserting a challenge to legislation which has existed in various forms but in substantially similar design for over 40 years.

Nevertheless, because of the nature of these proceedings, we have chosen to address the merits of this broad challenge to the traditional judicial election process. Specifically, petitioner contends that the designation on the ballot by entitlement as the "(name of incumbent) seat," coupled with the descriptive word after the incumbent candidate's name, violates equal protection constitutional guarantees by creating and preserving to the incumbent an unfair advantage. Further, he urges the court to invalidate statutes which purport to treat judicial incumbent candidates differently from any other candidates for public office in the State of Minnesota. In our analysis of this focal issue, we take the opportunity to identify the historical underpinnings and to trace briefly the evolution of this judicial election process.

The methods by which the federal system and other states initially select and then elect or retain judges are varied, yet the explicit or implicit goal of the constitutional provisions and enabling legislation is the same: to create and maintain an independent judiciary as free from political, economic and social pressure as possible so judges can decide cases without those influences. That that goal guided the framers

of the federal Constitution to grant life tenure to judges is evidenced by the writings of Alexander Hamilton[9] which expressed his concern that life tenure would provide judges sufficient security to allow them to rule with their consciences and according to the Constitution, rather than to bow to political notions. While the framers of our state constitution have developed a system of selection and election quite different from that federal scheme, they too designed a plan to recognize the uniqueness and independence of the state judiciary.

As early as 1857, those who attended the two separate state constitutional conventions[10] devoted considerable debate to the process by which the judiciary was to be selected and concluded that the now-recognized goal of distinguishing judicial elections from elections for other offices could best be accomplished by providing judges with 7-year terms.[11] In practical effect, because the length of term differed from that of other elective offices, judicial elections were held at times other than those routinely scheduled for those other offices. However, after 1883, when the term was reduced to 6 years,[12] the difficulties associated with partisan judicial elections became more evident. Thus, the selection debate resurfaced in significant respects in 1912 when the legislature enacted separate, nonpartisan ballot legislation;[13] in 1948 when a special constitutional convention composed of public and legislative members recommended wholesale revisions to the judicial article of the state constitution, detailing, among other practices dealing with

9. For example, in The Federalist No. 78, at 484 (G.P. Putnam ed. 1923), "as nothing can contribute so much to its [the judiciary's] firmness and independence as permanency in office, this quality may therefore be justly regarded as an indispensable ingredient in its constitution and, in a great measure, as the citadel of the public justice and the public security."

10. In Minnesota, there were two constitutional conventions, one held each by the republicans and by the democrats. The product of those separate meetings were two constitutional drafts which, through the process of compromise and negotiation, were consolidated and

then submitted to the voters for ratification. *See, e.g.,* M.S.A. Const., *Territorial Existence & Constitutional Statehood* at 151–52 (1976).

11. Minn. Const. art. 6, § 3 (1857) provides: "The judges of the supreme court shall be elected by the electors of the state at large, and their term of office shall be seven years, and until their successors are elected and qualified."

12. Amendment to art. 6, § 3, proposed by 1883 Gen.Laws, ch. 3, and adopted at the general election of 1883; 1885 Gen.Laws, p. 2.

13. 1912 Extra Session Laws, ch. 2.

regulation of the judiciary, a comprehensive scheme for elections when an incumbent is seeking reelection;[14] in the 1949 statutory amendments involving the fore-

**14.** While no constitutional amendments were approved in response to the committee's report, the proposals for new sections 9, 10, 12 and 13 of the judiciary article demonstrated the problems facing judges during the election process and proposed solutions.

**Sec. 9. Terms of Office; Election, Vacancies; Re-election.** *The term of office of all supreme court justices and all judges shall be six years and until their successors are qualified, and they shall be elected by the electors of the state, district, county, municipality, or other territory wherein they are to serve. Where more than one position on the same court is to be filled at an election and an incumbent is eligible to be a candidate to succeed himself, each candidate shall specify and the official ballot shall show, the position for which he is a candidate.*

*The legislature may provide that a vacancy in the office of justice of the supreme court shall be filled by appointment by the governor from a list of three persons nominated by a non-partisan judicial commission created by law. A person so appointed shall serve until his successor is elected for a six-year term at the first general election held more than one year after the occurrence of the vacancy, and when a justice once has been elected and is a candidate for re-election for the next and succeeding terms, the vote shall be on the question whether he shall be continued in office.*

Comment: A uniform term of office of six years is recommended for all judges.

The method of selection provided in the second sentence has been in successful operation in Ohio. Where several incumbents are running for re-election, each should stand or fall on the basis of his own record. The present system does not permit this since opposing candidates run against the field.

While judges in this state are now elected, the usual practice has been that judges first ascend the bench by appointment by the governor on a vacancy occurring. The voters, with some exceptions, have on succeeding elections returned the judges to the bench. The second paragraph of this proposed section authorizes the legislature to put this practice on a formal legal basis with the provision added that the governor shall make his appointment from recommendations received from a nonpartisan commission. This method of selection has been in operation in Missouri since 1941. The electorate there has twice approved it, once by adopting it as a constitutional amendment and again by refusing to repeal it. It is also in operation in California in modified form. It is the method of selection recommended by the American Bar Association. For a description of the plan and its successful operation in Missouri, see article by Justice Douglas of the Missouri Supreme Court entitled, "Missouri Plan Works Well in Actual Results" in 33 Am.Bar Assn.Jr. 1169 (1947). The plan has been modified here to become operative only when an appointed judge has once been chosen in competition with other candidates at a general election.

**Sec. 10. Terms Extended.** *When a justice or judge attains the age of 67 years during his term of office for which elected, such term is hereby extended until the date of his compulsory retirement under Section 12.*

Comment: The commission feels that when a judge is within three years of the retirement age, he should be permitted to continue in office without standing for reelection.

**Sec. 12. Retirement.** *Supreme court justices, district and probate court judges shall be retired upon reaching the age of 70 years. When the administrative council certifies to the governor that it appears that any such justice or judge is so incapacitated as substantially to prevent him from performing his judicial duties, the governor shall appoint a commission of three persons to inquire into the circumstances. On their recommendation the governor may retire such justice or judge from office. Retirement allowances for a justice or judge retiring hereunder who has held judicial office continually for ten or more years immediately preceding his retirement shall be provided by law.*

Comment: The source of this section is the recent constitution adopted in New Jersey. See its judiciary article, Section VI, subd. 3 and 5. New York also has a compulsory retirement age of 70 years. This age is also the most commonly accepted one in voluntary retirement plans.

**Sec. 13. Appointment.** *If the office of a justice or judge becomes vacant, except as otherwise provided by section 9, the governor shall appoint a qualified person to fill the vacancy to hold office until his successor is elected and qualified. This successor shall be elected at the first general election held more than one year after the occurrence of the vacancy and his term of office shall be six years and until his successor is qualified.*

Comment: This section increases the spread between appointment and the appointee's subsequent candidacy for election from 30 days to one year. The 30-day period, as provided in the present Section 10, has proved too short. Complications arise when a vacancy occurs after the primary election but more than 30 days prior to the final election. In addition, the short period does not give sufficient time to enable observation of the competence developed by the appointee prior to the election.

The provision that the election shall be for the full term of office incorporates the judicial interpretation given to the present provisions. See, Enger v. Holm, 213 Minn. 154; 6 N.W.(2d) 101. [ (1942) ]

runner of the statutory provisions here at issue;[15] again in the 1956 constitutional amendments to article 6, sections 8, 10 and 11;[16] and, finally, in 1972 in a report in which a newly convened constitutional study commission subcommittee recommended the implementation of a "Missouri plan" in addition to a change in the basic structure of the judiciary.[17]

Reflected in the considerable memorials to the recurring debates is the common thread of both public and legislative recognition that judicial elections are unique in this state's comprehensive elective scheme, demonstrating the fact that the powers conferred on the judicial branch differ markedly from those exercised by the other two branches of government.

Article 6 of our constitution vests "[t]he judicial power of the state in a supreme court * * * a court of appeals, a district court, and such other courts * * * as the legislature may establish." To assure competence in the exercise of the judicial power, the constitution specifies that holders of a judicial office must be "learned in the law." Minn. Const. art. 6, § 5. Implicit in this requirement is recognition that those elected as judges will be subject to the restrictive canons of conduct governing the profession of law.[18]

The need for a competent, impartial, and independent judiciary creates, however, the potential for conflicts of interest when the judicial office is an elective office. These potential conflicts arise between the demands of an election process and the judicial impartiality required to decide cases free from political maneuvering. To counter this potential conflict, the 1912 Legislature decreed that elections for judicial office be nonpartisan.

This inherent tension in the judicial election process was again recognized in a committee report to the 1972 Constitutional Study Commission, which urged the adoption of a retention-type election for incumbent judges. The report stated:

> The committee also believes that additional qualified lawyers will seek appointment to judicial office under such a method of selection. Under the present system, too many qualified and competent lawyers who are successful practitioners decline to be considered for fear they will give up their practice only to be defeated

Report of the Constitutional Commission of Minnesota, at 42–45 (1948).

15.   Minn.Stat. § 205.82 (1950).

16.   Minn. Const. art. 6, § 8 (1956) provides:
    The term of office of all judges shall be six years and until their successors are qualified, and they shall be elected in the manner provided by law by the electors of the state, district, county, municipality, or other territory wherein they are to serve.

    Minn. Const. art. 6, § 10 (1956) provides:
    The legislature may provide by law for retirement of all judges, for the extension of the term of any judge who shall become eligible for retirement within three years after expiration of the term for which he is selected and for the removal of any judge who is incapacitated while in office.

    Minn. Const. art. 6, § 11 (1956) provides:
    Whenever there is a vacancy in the office of judge the governor shall appoint in the manner provided by law a qualified person to fill

the vacancy, to hold office until his successor is elected and qualified. The successor shall be elected for a six year term at the next general election occurring more than one year after such appointment.

17.   The Missouri plan has been simply defined as follows:
    Under this plan, when a vacancy in a judicial office occurs, a non-partisan judicial commission submits three names to the governor who appoints one of them to fill the vacancy. After holding office for a limited period, the name of the appointee is submitted to the electorate without a competing candidate on the question: "Shall Judge _____ be retained in office?" If a majority of the votes cast on the question are in the affirmative, the appointee remains in office for a new and full term. If the vote is in the negative, the process is repeated.
    Pirsig, *The Proposed Amendment of the Judiciary Article of the Minnesota Constitution*, 40 Minn.L.Rev. 815, 838 (1956).

18.   *See* Code of Judicial Conduct, Canon 7 (1989).

by a politician with a popular name at some future election.

Judicial Branch Committee Report, Minnesota Constitutional Study Commission, at 24–25 (1972). In its report, the committee testified to the difficulties facing judges who seek reelection and the restrictions placed on their candidacy:

> No one debates the desirability of having judges responsive to the people. Nevertheless, the public finds it distasteful for judges to become embroiled in politics. They have no platform, they can make no promises, and they must remain completely uncommitted to other persons in politics or any other area of civic activity. It is unbecoming for judges to become so deeply immersed in civic matters that they may be disqualified to consider the merits of controversial issues. The method of retention at election as proposed in Section 7 [as an amendment to article 6, the judiciary article] would allow the public to reflect favorably or unfavorably on a judge's competence in office and, thus, retain ultimate control of the judiciary in the hands of the voting public.

*Id.*

While this state has opted for the election of judges and has declined to adopt a Missouri-type retention plan, it has provided its own variation of the election process. Section 10 of the original judiciary article provided for the filling of a judicial vacancy not by special election, but by appointment of the governor with an election to follow at the next annual election occurring more than 30 days after the vacancy. In 1972, this provision was amended to provide that an election to succeed the appointee be held "at the next general election occurring more than one year after the appointment."[19] It appears the extension of the time before an election for the office was, in the words of the 1972 subcommittee, "to allow the public to reflect favorably or unfavorably on a judge's competence in office" while, at the same time, "retain[ing]

ultimate control of the judiciary in the hands of the voting public." To achieve this purpose, it appears that the legislature considered it appropriate for the ballot to inform the voters which candidate was seeking retention.

The foregoing brief constitutional history amply supports the legislative prerogative of distinguishing judicial elections in manner and form from those legislative and executive elections conducted in the traditional partisan sense. It is against this background that the incumbency designations on judicial ballots, enacted in 1949, must be examined. We now reach, the question of whether the distinctive legislative treatment given judicial ballots survives equal protection scrutiny.

The petitioner appears to proceed from the assumption that the level of equal protection scrutiny is an open question with regard to judicial elections. We reject petitioner's premise. Application of the rational-basis test to judicial election practices is neither new nor novel. While we did not identify it as such in *Gustafson v. Holm*, 232 Minn. 118, 44 N.W.2d 443 (1950), we essentially applied that same rational-basis analysis in discussing (1) the historical significance and vitality of the alley system concept by which each justice holds a separate seat and (2) the basis for allowing the designation of "incumbent" to identify a present justice seeking reelection.

In *Gustafson*, we stressed the fact that the purpose of these two separate identifications is informational, not to give the incumbent an advantage. The fact that this designation in a particular election may provide the incumbent with an advantage over other candidates does not necessarily invalidate the statute. We reasoned:

> Use of the word "incumbent" following the candidate's name, simply informs the voter of the person who presently holds the position. In assisting voters to cast their votes intelligently for offices

---

19. The commission determined to leave the power of judicial appointment in the hands of the governor, but added to the committee's recommendation a provision that the governor may fill judicial vacancies created by incumbents not filing for reelection.

unfamiliar to the average voter, it is only a matter of fairness that he be advised who the present judge is. If he then believes that the judge should be retained, he has the opportunity of expressing his opinion by his vote. If he feels that the present judge should be replaced, he has a like opportunity of so indicating his opinion. The underlying purpose of the legislation is to identify the candidate so that the voter will know whom he is voting for. In order to enable the electorate to know who candidates are, it is not always possible to treat all candidates with absolute equality.

232 Minn. at 126–27, 44 N.W.2d at 447.

The *Gustafson* decision did not specifically address the equal-protection argument as raised by petitioner. However, all of the ingredients are found in the decision to compel its application to conclude that the statutory ballot form withstands scrutiny under our modern rational-basis test. We, therefore, reaffirm our holding in *Gustafson* that Minn.Stat. § 205.82 (1950), the predecessor of current Minn.Stat. § 204B.36, subds. 4, 5, does not contravene the equal protection guarantees of the state constitution. A logical extension and application of the "separate seat" concept of a judicial office is that the legislature is authorized to select a manner of identification of that seat which promotes and clarifies the distinction between the separate offices. Similarly, that same "incumbency analysis" supports a conclusion that the continued use of the term "incumbent" to denote the person who presently holds the office for purposes of informing the voter is no less valid today than it was in 1950. We noted in *Gustafson* that the designation is "intended for the benefit of the voter, not the candidate. Even though the candidate indirectly may derive some benefit from such identification, it does not follow that the legislation is unconstitutional."

232 Minn. at 127–28, 44 N.W.2d at 448. *See also Dougherty v. Holm,* 232 Minn. 68, 44 N.W.2d 83 (1950).

In *Ulland v. Growe,* 262 N.W.2d 412 (Minn.1978), *cert. denied sub nom. Berg v. Growe,* 436 U.S. 927, 98 S.Ct. 2822, 56 L.Ed.2d 770 (1978), the constitutionality of a statute governing ballot placement of candidates for legislative or executive partisan office was challenged by plaintiff, who, as an independent candidate, pointed out that he would never have his name appear first on the ballot. This court held that the ballot classifications were not without a rational basis and, this being so, it was not this court's role to interfere. We quoted with approval from *Clough v. Guzzi,* 416 F.Supp. 1057, 1068 (D.Mass. 1976):

The fact that some statistical advantage may at the same time accrue to one of the candidates by virtue of his or her incumbency does not for constitutional purposes invalidate that otherwise legitimate purpose, especially where that advantage remains problematic and variable from election to election. And whether for purposes of a more absolute fairness that advantage warrants a different statutory scheme is properly a legislative consideration.

262 N.W.2d at 418.

Recognizing the different role the judicial branch plays in our government, the legislature has historically treated judicial election ballots differently from ballots for other elective offices. The reason for this different treatment is evident from the history of the judiciary article in our constitution, its statutory implementation over the years, and past judicial precedent. Whatever advantage there may be to the incumbent from the incumbency designation on the ballot, it is clear that the overriding purpose of the ballot designation has been to assure an able, independent and stable judiciary while, at the same time, requiring incumbent judges to submit to voter appraisal in an open election. These are legitimate considerations which satisfy the equal protection clause of our state constitution as well as the federal Constitution.

The task of the voter in considering candidates for judicial office is a difficult one, made more difficult by the nature of the office itself: a position that requires its holder studiously to avoid partisan politics, refrain from all discussions of public issues and restrict one's membership and participation in organizations to those primarily of a professional nature. The incumbency designation is but one means by which the voter can be informed that the individual seeking reelection offers to the voters as a qualification for candidacy that fact of present judicial service.

It seems clear that Minnesota has adopted its own middle-of-the-road approach to judicial selection. The open election process has been retained, but with a quasi-retention feature which simply informs the voter who the incumbent candidate is and who the challenger is. This arrangement acts as a check on the gubernatorial appointment process by keeping the ultimate choice with the voters while, at the same time, recognizing the unique independent nature of the judicial function. This approach is authorized by our constitution as it has developed over the years, and its features, as we have demonstrated and previously held, do not violate the equal protection process of either the federal or state constitution.

Petition denied.

KEITH, C.J., and TOMLJANOVICH and GARDEBRING, JJ., took no part in the consideration or decision of this matter.