**John A. WINTERS, Petitioner,**

v.

**Mary KIFFMEYER, Minnesota Secretary of State, Respondent.**

No.  C8–02–1180.

Supreme Court of Minnesota.

Aug. 30, 2002.

John A. Winters, Winters Law Office, Crookstom, for Petitioner.

Mike Hatch, Attorney General, Alan I. Gilbert, Chief Deputy and Solicitor General, Kenneth E. Raschke, Jr., Assistant Attorney General, St Paul, for Respondent.

## OPINION

PAGE, Justice.

Petitioner John A. Winters seeks relief under Minn.Stat. § 204B.44 (2000) from an alleged wrongful act by the secretary of state for her failure to place Winters' name on the ballot for the 2002 election as a candidate for the judicial seat currently held by the Honorable Donna Dixon of the Ninth Judicial District. It is the secretary of state's position that the seat is not up for election until the 2004 general election. This opinion confirms the order filed on July 25, 2002, denying the petition.

On October 24, 2001, Governor Jesse Ventura filed with the secretary of state a "Notice of Appointment" of Donna Dixon to fill a judicial vacancy in the Ninth Judicial District. The notice of appointment states that the governor has "appointed and commissioned" Judge Dixon to hold the office of judge of district court effective November 9, 2001, with the term to continue until January 3, 2005. Judge Dixon was sworn in and took office on November 9, 2001. Consistent with the length of the term indicated on the notice of appointment, the secretary of state did not designate Judge Dixon's seat as a judicial seat subject to election in the 2002

election scheduled to take place on November 5, 2002.

Winters claims that he has had a "general interest for several months in possibly running" against Judge Dixon, but did not know whether she was up for election in 2002. Winters claims that, since May 2002, he has checked the secretary of state's website and telephoned that office to determine whether the seat was up for election, without receiving a clear answer. These efforts intensified in late June and early July, in anticipation of the July 2–16, 2002, candidate filing period. Winters was informed by a court administrator on July 1, 2002, that Judge Dixon's seat was not subject to election in 2002. Shortly thereafter he received a copy of the notice of appointment of Judge Dixon, and thought there was something "technically wrong" with the appointment, but decided not to run against Judge Dixon in any event. However, after reading about this court's decision in another ballot contest, he reconsidered his decision not to run. On July 10, 2002, by petition for writ of mandamus filed as an original action in this court, Winters sought an order requiring the secretary of state to hold an election for Judge Dixon's seat. We dismissed the petition for lack of jurisdiction.[1] On July 17, 2002, Winters filed the instant petition for relief under section 204B.44. We ordered expedited briefing, specifically ordering the parties to brief whether the relief requested in the petition should be barred by laches.

The issue presented in Winters' section 204B.44 petition involves interpretation of Article VI, section 8, of the Minnesota Constitution, which provides:

**1.** Pursuant to Minn.Stat. § 586.11 (2000), the district court has exclusive original jurisdiction in cases of mandamus except when the writ is to be directed to a district court or the court of appeals or a judge of either the district court or the court of appeals. Because the writ was to be directed to the secretary of state, jurisdiction was in the district court and not this court pursuant to statute.

Whenever there is a vacancy in the office of judge the governor shall appoint in the manner provided by law a qualified person to fill the vacancy until a successor is elected and qualified. The successor shall be elected for a six year term at the next general election occurring more than one year after the appointment.

Specifically, we must determine when Judge Dixon's appointment was made-on October 24, 2001, when the governor filed the notice of appointment, or on November 9, 2001, the effective date of the appointment pursuant to the governor's notice. The answer to that question determines whether the successor is to be elected this year, the first general election more than one year after October 24, 2001, but less than one year after November 9, 2001, or in 2004, the first general election occurring more than one year after November 9, 2001. The answer to that question, therefore, also determines whether the secretary of state has committed or will commit a "wrongful act, omission, or error" by not placing Judge Dixon's seat on the ballot for the 2002 election. *See* Minn.Stat. § 204B.44(d) (2000).

Winters claims that, under Article VI, section 8, of the Minnesota Constitution, Judge Dixon's judicial seat should be up for election in 2002 because more than one year has elapsed since her appointment. Acknowledging that the constitution does not give much guidance on the issue of when the one-year period begins to run and that the legislature has passed no statute clarifying the operative act establishing when an appointment is made, Winters relies on the common meaning of the word "appointment" and argues that the common meaning "does not allow for some future effective date of the appointment." Winters claims that there is a need for a definitive act to constitute an appointment, and the date the governor's notice of appointment is filed with the secretary of state should constitute that act. He argues that to hold otherwise allows the governor to defeat judicial elections, the primary method of selection of judges mandated by the constitution.

In contrast, the secretary of state claims that Judge Dixon's appointment did not occur until November 9, 2001, and therefore under the constitution a successor is to be elected at the first general election occurring more than one year thereafter, which in this case would be the 2004 general election. The secretary of state claims that the opposite result would conflict with the constitutional purpose of allowing an appointed judge a minimum of one year to demonstrate her capabilities before being required to stand for election.

I.

We first consider whether laches should bar consideration of Winters' petition. Laches is an equitable doctrine applied to "prevent one who has not been diligent in asserting a known right from recovering at the expense of one who has been prejudiced by the delay." *Aronovitch v. Levy*, 238 Minn. 237, 242, 56 N.W.2d 570, 574 (1953). The doctrine has particular application in challenges to ballot preparation and election proceedings:

> The very nature of matters implicating election laws and proceedings routinely requires expeditious consideration and disposition by courts facing considerable time constraints imposed by the ballot preparation and distribution process. As a result, we have examined applications for relief not only on their merits, but also from the perspective of whether the applicant acted promptly in initiating proceedings.

*Peterson v. Stafford*, 490 N.W.2d 418, 419

(Minn.1992).[2]

"In considering laches, we have held that the practical question in each case is whether there has been such an unreasonable delay in asserting a known right, resulting in prejudice to others, as would make it inequitable to grant the relief prayed for." *Fetsch v. Holm,* 236 Minn. 158, 163, 52 N.W.2d 113, 115 (1952). In this case, Winters made some inquiries into whether the seat would be subject to election, but took no direct action until July 10, well into the filing period for the office. Other potential candidates and the sitting officeholder would be prejudiced by his delay. Running for any office requires a significant commitment of time and other resources. A candidate must organize a campaign committee, including finding a treasurer knowledgeable in the requirements of Minnesota Statutes chapter 10A that govern the operation of campaigns in Minnesota. *See* Minn.Stat. ch. 10A (2000) (delineating registration and reporting requirements for candidates for statewide office, including judges). The candidate must register the committee, decide when, where, and how to campaign, and then do so. In light of the nature of campaigns for public office, the sitting officeholder and other potential candidates will be materially prejudiced by an unexpected order to hold an election. Finally, Winters has presented no persuasive reason [3] why he could not have brought this petition in a timely manner so as not to prejudice others in this fashion.

The late date at which Winters decided to pursue relief in this case, coupled with the significant effect that ordering an election would have on the current officeholder and other potential candidates for the seat, gives us great concern. Thus, the application of laches would be appropriate. Nonetheless, the need for certainty in the judicial election process compels us to address the merits of Winters' petition. *See Peterson,* 490 N.W.2d at 420 (addressing merits of case "because of the nature of these proceedings" despite concluding that petitioner did not act with dispatch in asserting challenge):

## II.

■ Under the Minnesota Constitution, a successor to an appointed judge is elected for a six-year term "at the next general election occurring more than one year after the appointment." Minn. Const. art. VI, § 8. We must decide, then, when an appointment is made for these purposes. Winters argues that the appointment is made when the governor's notice of appointment is filed with the secretary of state; the secretary of state argues that

**2.** In this case, the secretary of state's time constraints are considerable. Between June 1 and July 1, 2002, the secretary of state must notify each county auditor of the offices to be voted on in that county. Minn.Stat. § 204B.33(a) (2000). Not later than 42 days before the primary (July 30, 2002, in this case), the secretary of state must certify to each county auditor the names of all candidates who have properly filed affidavits of candidacy with her office. Minn.Stat. § 204D.06 (2000). In addition, absentee ballots must be available at least 30 days before the September 10 primary election (August 9, 2002, in this case). *See* Minn.Stat. § 204B.35, subd. 4 (2000).

**3.** Winters claims that only upon learning of this court's order in *Zettler v. Ventura,* No. C8–02–1048 (Minn. July 3, 2002) (granting a section 204B.44 petition and ordering the secretary of state to hold an election for a judicial seat), was he emboldened to seek relief from the secretary of state's action with respect to Judge Dixon's seat. However, the legal issues presented in the *Zettler* case and this case are entirely distinct, and the result in *Zettler* should not have factored into the legal analysis of whether relief was warranted under section 204B.44.

the appointment is not made until its effective date. We hold that, for purposes of Article VI, section 8, a judicial appointment is made on its effective date.

Winters claims that the common meaning of "appointment" does not allow for some future date of the appointment. The common meaning of "appointment"—the designation of a person for an office—has two components, a person and an office. Here, the effective date describes the office at issue. Until the effective date, the office is not available to and cannot be claimed by the appointee. Therefore, the effective date is part and parcel of the appointment.[4]

In support of his argument, Winters also refers us to the source of all judicial authority, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), which held that an appointment is effective when the "last act" required of the appointing authority has been completed. The issue in *Marbury* was whether James Madison as secretary of state should be commanded to deliver certain commissions of justices of the peace of the District of Columbia. Marbury's appointment was one of several made by President John Adams before he left the office of the presidency. Madison refused to deliver the commissions, and in addition to establishing the authority of the courts to "say what the law is," the Court addressed the question whether the appointment was complete upon the appointment and president's signature of the commission, or upon delivery of the signed commission.[5] The Court stated:

> This is an appointment made by the president, by and with the advice and consent of the senate, and is evidenced by no act but the commission itself. In such a case, therefore, the commission and the appointment seem inseparable; it being almost impossible to show an appointment otherwise than by proving the existence of a commission; still the commission is not necessarily the appointment, though conclusive evidence of it.

> But at what stage does it amount to this conclusive evidence?

> The answer to this question seems an obvious one. The appointment being the sole act of the president, must be completely evidenced, when it is shown that he has done every thing to be performed by him.

> Should the commission, instead of being evidence of an appointment, even be considered as constituting the appointment itself; still it would be made when the last act to be done by the president was performed, or, at furthest, when the commission was complete.

*Id.* at 157.

Winters argues that under *Marbury* Judge Dixon's appointment was complete when the last act of the governor was taken, the filing of the notice of appointment with the secretary of state on October 24, 2001. There are, however, impor-

---

4. The dissent relies on the asserted practice of past governors of considering the desires of the appointee in establishing the effective date of the appointment. While accommodating the legitimate needs of appointees to disengage from law practices may be the practice, the governor clearly has the authority to unilaterally set the effective date. Thus, the effective date is exclusively part of the appointing authority, and is not subject to veto or annulment by the appointee.

5. The relevant constitutional provision, Article II, provides that the president "shall nominate, and, by and with the advice and consent of the senate, shall appoint ambassadors, other public ministers and consuls, judges of the Supreme Court, and all other officers of the United States, whose appointments are not herein otherwise provided for * * *." U.S. Const. art. II, § 2.

tant distinctions between the appointment and commission in *Marbury* and the appointment at issue herein. First, the appointment in this case carried with it an effective date at a point in the future. The judge was not authorized to assume office until that date. In contrast, in *Marbury*, once the commission was signed the official was entitled to the office.

> The discretion of the executive is to be exercised until the appointment has been made. But having once made the appointment, his power over the office is terminated in all cases, where by law the officer is not removable by him. The right to the office is *then* in the person appointed, and he has the absolute, unconditional power of accepting or rejecting it.

*Id.* at 162. The second important distinction is that in *Marbury* the salary of the officer commenced from his appointment, not the delivery of the commission. Thus, the officer presumably began to serve upon the appointment and did not await the delivery of the commission. In this case, the judge does not begin to serve in office until the effective date of the appointment and after taking the oath of office. *See* Minn.Stat. § 358.05 (2000) (requiring every appointed or elected public official to take the oath of office defined in Minn. Const. art. 5, § 6). As such, the judge's salary cannot commence until service in office begins—and never before the effective date of the appointment.

Actual service in office was significant to the determination of when the appointment occurred in *Marbury, see* 5 U.S. at 162; likewise here, when a notice of appointment carries an effective date that signals the judge's ability to claim the office, that date governs when the appointment has occurred.

The effect of this interpretation is that an appointed judge who claims the office upon the effective date of the appointment will actually serve in office for at least one year before a successor is elected. Presumably, the appointed judge will want to continue in office by being elected to the position, and considering the appointment to occur on its effective date gives the public an opportunity to "reflect favorably or unfavorably on a judge's competence in office." *Peterson,* 490 N.W.2d at 423 (quoting *Minnesota Constitutional Study Commission, Judicial Branch Committee Report* (1972)); *see also State ex rel. Hennepin County Bar Ass'n v. Amdahl,* 264 Minn. 350, 357, 119 N.W.2d 169, 173 (1962) ("The complexity of modern society makes it imperative that ample opportunity be given the people to evaluate the qualifications of candidates for judicial positions.").[6] We stated in *Peterson* that one purpose of the amendment to Article VI, section 8, extending the time before an election for judicial office from 30 days to one year, was to allow for such evaluation by the public. *Peterson,* 490 N.W.2d at 423. However, under Winters' interpretation of when the appointment was made, the public may have less time to evaluate a sitting judge than contemplated by the constitution.

Winters also directs our attention to *Division of Elections of State v. Johnstone,* 669 P.2d 537 (Alaska 1983), in which the Supreme Court of Alaska reversed a district court ruling that the date of appoint-

---

**6.** The dissent overstates our reliance on *Peterson* and *Amdahl.* We do not suggest that these cases addressed when an appointment is made for purposes of Article VI, section 8; we simply note there is a policy reflected in those decisions that the public have an opportunity to evaluate a judge's competence. To give full effect to this policy, we interpret Article VI, section 8, to require one year of service before a successor is chosen by election.

ment under the state constitution is the date on which the judge assumed office, and held instead that the appointment was made when the governor selected or designated the person to fill the office. *Id.* at 540. The Alaska Constitution provides for retention elections for all superior court judges and supreme court justices through a "nonpartisan ballot at the first general election held more than three years after his [or her] appointment." Alaska Const. art. IV, § 6. Karl Johnstone was appointed by the governor of Alaska on October 8, 1979, to fill a superior court seat and assumed office on December 13, 1979. The issue presented was whether Judge Johnstone was required to stand for election in the general election of 1982 or 1984. The court found the plain meaning of the word "appointment" ("the selection or designation of a person * * * to fill an office") persuasive. *Johnstone,* 669 P.2d at 539.

As part of its analysis, the Alaska Supreme Court recounted the history of its retention election system for judges and noted that the framers of the Alaska Constitution intended to "offer potential judges a reasonably long first term in order to provide a measure of job security sufficient to attract meritorious candidates to the bench." *Johnstone,* 669 P.2d at 544. However, the court noted that, given the breadth of the three-years-from-appointment provision, this purpose was "neither served nor disserved by choosing one date as opposed to the other for Johnstone's retention election." *Id.* at 545.

In contrast, the determination of when the appointment is made under the Minnesota Constitution affects whether voters will have one year of service on which to assess the competence of a recently ap-

pointed judge, as we believe the framers of our constitutional provision intended. If, as Winter claims, an appointment is made when the governor announces it, voters could have significantly less than one year of service on which to evaluate the appointed judge's performance. We read the opinion in *Johnstone* to signify that the determination of when the appointment was made did not affect achievement of the goals of the framers of the Alaska Constitution. *See Johnstone,* 669 P.2d at 545. Because in this case determination of when the appointment is made affects whether the purposes of our constitutional provision to allow at least one year of service are met, we decline to follow *Johnstone.*

Finally, we note that our interpretation of the term "appointment" is consistent with the legislature's use of the term. There is elsewhere in the law a recognition that written notice of an appointment may be made before an actual appointment. *See* Minn.Stat. § 15.0597, subd. 6 (2000). Other statutes describe a term of office, presumably constituting a term of actual service, from the date of appointment. *See* Minn.Stat. §§ 488A.03, subd. 2(c) (2000), 488A.03, subd. 3a(e) (2000), 488A.04 (2000). These provisions are consistent with construction of the term "appointment" in Article VI, section 8, as the effective date of the appointment.[7]

We therefore hold that, for purposes of Article VI, section 8, an appointment is made on its effective date and a successor must be elected to the position at the next general election occurring more than one year after the effective date of the appointment. As such, there has been no wrongful act, omission, or error on the part of the secretary of state in not designating

---

7. The dissent posits that considering the appointment to be made on its effective date will create mischief by allowing a governor to extend his or her appointing authority beyond

the governor's term. These facts are not before us, and we choose not to rule based on a hypothetical and perhaps cynical view of the future use of the appointing authority.

Judge Dixon's judicial seat for election in 2002.

Petition denied.

MEYER, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

ANDERSON, Paul H., Justice (concurring in part and dissenting in part).

I share the majority's concern regarding the significant prejudice to those who would be affected by a ruling granting Winters' petition. Further, I conclude that the facts in this case weigh strongly in favor of holding that this action is barred by laches. However, I disagree with the majority's holding that a judicial appointment is made only upon its effective date.

Adequate notice regarding judicial elections was the genesis for the amendment of Article VI, section 8 at issue herein. *See State ex rel. Hennepin County Bar Ass'n v. Amdahl*, 264 Minn. 350, 359, 119 N.W.2d 169, 174 (1962). Thus, it is somewhat ironic that less than 60 days before the primary election petitioner brings a petition asking us to declare a seat subject to election under Article VI, section 8. Petitioner cannot reasonably expect that others who might aspire to Judge Dixon's seat, including Judge Dixon, can instantly prepare for an election, and this court should not facilitate an unanticipated election being called at this late date. Petitioner admits that he had a "general interest for several months" in running for this seat, but failed to take any action to trigger an election. Although he claims he did not get a clear answer on whether the position was up for election, he could have taken action to get that answer, but he did not. A section 204B.44 petitioner simply cannot sit idly by while election preparations are made, or, in this case, not made, and expect the court to grant relief. Thus, I agree with the majority that the petitioner's dilatory conduct and the potential harm to those affected by a ruling from this court ordering an election call for application of laches.

Nevertheless, on the merits I cannot agree with the majority that, for the purposes of Article VI, section 8, an appointment is made only on its effective date—as defined by the appointing authority in the notice of appointment. When analyzing this issue, the court should begin with the plain meaning of the word appointment: "[t]he act of designating a person, such as a nonelected public official, for a job or duty," *Black's Law Dictionary* 96 (7th ed.1999); or "[t]he act of appointing or designating for an office or position," *The American Heritage Dictionary of the English Language* 89 (3d ed.1992). A designation is simply the identification of the person chosen; it does not require assumption of the duties of the office. I find no support for the majority's focus on the judge's ability to claim the office when the word appointment has no correlation to this concept. The more appropriate focus when interpreting this word is on the acts of the appointing authority rather than the acts of the appointee.

I conclude that *Marbury* answers with clarity the question of when an executive appointment is made—when the last act required of the appointing authority has been completed.[1] *See Marbury v. Madi-*

1. A series of cases since *Marbury* have reaffirmed this interpretation of "appointment": *United States v. Le Baron*, 60 U.S. (19 How.) 73, 78, 15 L.Ed. 525 (1856) (dealing with the appointment of a deputy postmaster); *Molnar v. City of Aurora*, 38 Ill.App.3d 580, 348 N.E.2d 262, 264 (1976) (dealing with the appointment of a fire fighter to the rank of lieutenant); *McChesney v. Sampson*, 232 Ky. 395, 23 S.W.2d 584, 587 (1930) (dealing with

*son,* 5 U.S. (1 Cranch) 137, 157, 2 L.Ed. 60 (1803). Neither the majority nor the secretary of state identifies another act of the governor after the notice of appointment is issued and filed with the secretary of state. The notice is "an open, unequivocal act" as described in *Marbury* that signals the completion of the executive appointment duty. *Id.* Therefore, I can only conclude that the appointment is made when the notice of appointment is filed with the secretary of state.

The majority attempts to distinguish *Marbury* on the basis that the officials in that case had assumed the office and were being paid and then concludes that an appointment does not occur until the official assumes the office and is paid. This reasoning is faulty—the Court in *Marbury* did not look to when payment began as signaling the appointment. Rather, the date on which the executive had taken the final act for appointment was dispositive and signaled that the appointee could claim the office and was entitled to payment. *Id.* at 161–62.

For judicial appointments in Minnesota, an appointee may claim the office on or after the effective date established in the notice of appointment. The appointee may even consult with the governor as to the effective date of the appointment. That date may be sooner or later, often depending on the appointee's need to wrap up a law practice or other commitments. In light of these practical realities, the effective date of an appointment can in no way be considered part of the executive's "designation of a person for office." Instead, the appointee can claim the office earlier, presumably directly on the heels of the

notice of appointment. The Court in *Marbury* made clear, however, that the actions of the appointee do not negate an appointment. *Id.* at 161 (stating that appointee may resign position or refuse to accept, "but neither the one nor the other is capable of rendering the appointment a nonentity."). As such, in *Marbury* service in office did not signify the appointment. Likewise, the effective date of a judicial appointment in Minnesota, which is sometimes based on the appointee's schedule, cannot signify the appointment.

The majority also supports its conclusion with reference to the presumed intent of Article VI, section 8 to allow judicial appointees to actually serve in office for one year before facing election. But that intent is not apparent in section 8, which states only that a successor to an appointee shall be elected "at the next general election occurring more than one year after the appointment." Minn. Const. art. VI, § 8. Instead, the majority relies on a statement in *Peterson* that one purpose of the amendment to section 8 was to give the public an opportunity to "reflect favorably or unfavorably on a judge's competence in office." *Peterson v. Stafford,* 490 N.W.2d 418, 423 (Minn.1992).

I fail to find support in *Peterson* for the majority's conclusion. The issue in *Peterson* was whether a statute providing for designation of an incumbent as such on the ballot was constitutional. *Id.* at 419. Thus, section 8 was not implicated in the ruling, and the statement the majority relies upon was certainly dicta. Moreover, taken in context, the statement in *Peterson* does not require an interpretation of appointment to mean the effective date.

the appointment of a member to the state textbook commission); *Smith v. State,* 200 Miss. 184, 26 So.2d 543, 544 (1946) (dealing with the appointment of a special judge to serve during the illness of another judge);

*Thomas v. McGrath,* 145 N.J.Super. 288, 367 A.2d 898, 901–02 (Ct.App.Div.1976), *rev'd on other grounds,* 75 N.J. 372, 382 A.2d 1121 (1978) (dealing with the appointment of a sergeant of county detectives).

[Section 8] was amended to provide that an election to succeed the appointee be held "at the next general election occurring more than one year after the appointment." It appears the extension of the time before an election for the office was, in the words of the 1972 subcommittee, "to allow the public to reflect favorably or unfavorably on a judge's competence in office" while, *at the same time, "retain[ing] ultimate control of the judiciary in the hands of the voting public."* To achieve this purpose, it appears that the legislature considered it appropriate for the ballot to inform the voters which candidate was seeking retention.

*Id.* at 423 (emphasis added). There is nothing in this language to indicate that the court in *Peterson* or the framers of our state constitution thought one full year of actual service in office was necessary for voters to reflect on the competence of the appointee. It is reasonable to presume that a newly appointed judge will take office not long after appointment.[2] As such, the public will have an opportunity to reflect on the judge's competence based on the time that judge serves before election day.

Moreover, the language quoted from *Peterson* demonstrates that allowing the public to reflect on the judge's competence was not the only intent of the framers—they also considered "ultimate control" by

the electorate important. *Id.* This language could equally support an interpretation of the term appointment that requires an election within one year of the notice of appointment to ensure ultimate control by the electorate. For these reasons, *Peterson* does not establish that one full year of actual service before election is the only permissible interpretation of the word appointment in section 8. Likewise, language in *Amdahl* that the majority takes to signify an intent that an appointee actually serve in office for one year before election,[3] and the *Peterson* language quoted above, is more accurately read to require only sufficient notice to the public of who the candidates are, not the particular qualification of the incumbent.

Finally, one result of the majority's holding is to open the door to a certain mischief in the appointment process. Under the majority's holding, a governor not running for reelection could notice the appointment of a judge to take effect in the term of the next governor. Indeed, a sitting judge who intends to retire or resign within the next governor's term could notify the sitting governor of that fact, with a future date of resignation. There is nothing in the majority's opinion that would prevent the sitting governor from noticing the appointment of a successor judge to take effect in future years, thereby extending the "appointment" into the term of the governor's successor. This result is clear-

---

**2.** As the majority notes, we expect candidates for judicial office to deliberate over the decision and be prepared to take timely action to secure the position. We should expect the same of those who apply to the governor for appointment to the bench. I find the example the majority gives of an October 31, 2003 notice of appointment and June 1, 2004 effective date to be unrealistic and contrary to the need to fill judicial vacancies in a timely manner.

**3.** The majority quotes the following language from *Amdahl*: "The complexity of modern society makes it imperative that ample opportunity be given the people to evaluate the qualifications of candidates for judicial positions." Note the use of the term "candidates" rather than "incumbents" or "sitting judges." This language must be read to refer not just to the incumbent appointee, but all candidates, and therefore the proposition does not support the conclusion that an incumbent must serve in office for at least one year.

ly contrary to the appointing authority of the governor in office at the time the vacancy actually occurs. *See* Minn. Const. art. VI, § 8. This absurd result further compels me to conclude that the date of appointment is the date the notice of appointment is filed with the secretary of state.

In short, it appears that the majority strains to reach its interpretation of appointment. The plain meaning of the term, coupled with the force of precedent in *Marbury* and *Amdahl,* leads to the conclusion that an appointment is made when the governor completes the last act necessary to the function: filing with the secretary of state a notice of appointment. For this reason, I respectfully dissent in part.