Jill CLARK, an individual and candidate for Minnesota Supreme Court Associate Justice, Seat # 4, and Heather Robins, an individual and a registered voter, Petitioners,

v.

Tim PAWLENTY, in his official capacity as Governor of the State of Minnesota, Mark Ritchie, in his official capacity as Secretary of State of the State of Minnesota, and Fran Windschitl, Rice County Auditor, Respondents.

No. A08–1385.

Supreme Court of Minnesota.

Sept. 5, 2008.

Jill Clark, Golden Valley, MN, for petitioners.

Lori Swanson, Attorney General, Kenneth E. Raschke, Jr., Nathan J. Hartshorn, Assistant Attorneys General, St. Paul, MN, for respondents Governor Tim

Pawlenty and Secretary of State Mark Ritchie.

G. Paul Beaumaster, Rice County Attorney, Faribault, MN, for respondent Fran Windschitl, Rice County Auditor/Treasurer.

Lewis A. Remele, Jr., Charles E. Lundberg, Paula M. Semrow, Bassford Remele, Minneapolis, MN, for respondent Justice Lorie Skjerven Gildea.

## OPINION

PER CURIAM.[1]

On August 14, 2008, petitioners Jill Clark and Heather Robins filed a petition pursuant to Minn.Stat. § 204B.44 (2006), seeking an order, applicable to both the primary and general elections, directing that Associate Justice Lorie Skjerven Gildea's name be stricken from the official state ballot or, alternatively, that designation of Justice Gildea as the incumbent be stricken from the ballot. After expedited briefing, the court heard oral argument on August 26, 2008. So as not to impede the orderly administration of the election, the court issued an order on August 26, 2008, dismissing Governor Tim Pawlenty as a party-respondent in the matter and denying the petition, with this opinion to follow.

On December 15, 2005, Governor Pawlenty announced the appointment of Justice Russell A. Anderson, then an associate justice on the Minnesota Supreme Court, as chief justice to fill the vacancy created by the resignation of Chief Justice Kathleen Blatz. The Governor also announced the appointment of Lorie Skjerven Gildea, then a district court judge in Hennepin County, to replace Justice Anderson as associate justice. Chief Justice Anderson

---

1. Heard, considered, and decided by James H. Gilbert, Acting Chief Justice, Lawrence R. Yetka, Bruce D. Willis, Gordon W. Shumaker, and Marilyn B. Rosenbaum, Acting Associate Justices, appointed pursuant to Minn. Const. art. VI, § 2, and Minn.Stat. § 2.724, subd. 2 (2006).

and Justice Gildea were sworn in on January 23, 2006.

On July 1, 2008, Justice Gildea filed for election to Associate Justice, Seat # 4, the seat to which she had previously been appointed. The November 4, 2008 election is the next general election occurring more than one year after Justice Gildea's appointment and follows the primary election set for September 9, 2008. On July 15, 2008, petitioner Clark, a licensed Minnesota attorney and Minnesota resident, filed for election to the same seat.[2] On August 11, 2008, Clark obtained a sample ballot from the Rice County Auditor.[3]

Clark and Robins filed their ballot-challenge petition on August 14, 2008. The petition named Governor Pawlenty, Secretary of State Ritchie, and Rice County Auditor Windschitl as respondents. On August 15, 2008, the court ordered petitioners to serve a copy of the petition and any supporting documents on all other candidates for Associate Justice, Seat # 4, and allowed petitioners until August 18, 2008, to serve and file any additional materials supporting their petition. Petitioners filed an amended petition on August 18. On August 21, 2008, the court received responses to the petition on behalf of Governor Pawlenty, Secretary of State Ritchie, Rice County Auditor/Treasurer Windschitl, and Justice Gildea. Petitioners filed a reply on August 22, and as noted above, argument was heard on August 26.

Petitioners first claim that Justice Gildea's name should be removed from the official ballot, asserting that a judge appointed by the governor to fill a judicial vacancy is barred from running for election to retain the office. Because Justice Gildea was appointed by the Governor in 2006 to fill the vacancy in Seat # 4 created by the appointment of Justice Anderson as chief justice, petitioners assert that Article VI, § 8, bars her from running for election for Seat # 4.

Alternatively, if Justice Gildea is not removed from the ballot, petitioners contend that the "incumbent" designation required by Minn.Stat. § 204B.36, subd. 5 (2006), should not be printed after Justice Gildea's name on the ballot. Petitioners make several arguments in support of striking the incumbent designation. First, petitioners make two statutory arguments. They assert that the incumbent designation required by section 204B.36, subd. 5, applies only to candidates who were previously elected to the position; that is, a person appointed to the seat is not an incumbent for purposes of section 204B.36, subd. 5. Petitioners also contend that the incumbent designation conveys an advantage to the candidate that is prohibited by Minn.Stat. § 204B.35, subd. 2 (2006).

Second, petitioners claim that the incumbent designation required by statute offends the Minnesota Constitution because it infringes on the voters' right to select judges by election.

Finally, petitioners contend that the incumbent designation, either alone or in combination with the governor's initial appointment to fill a judicial vacancy, violates petitioner Clark's rights as a candidate and petitioner Robins's rights as a voter under the First Amendment to the United States Constitution.

---

**2.** Two others—Deborah Hedlund (a district court judge in Hennepin County) and F. Richard Gallo, Jr.—also filed for the seat and were served with the petition, but did not appear in these proceedings.

**3.** Petitioner Robins is a resident of Rice County, Minnesota, a voter and former elected official.

## I.

█ The Governor and the Secretary of State each seek dismissal from the case. We conclude that Governor Pawlenty is neither a proper nor necessary party based on the claims made and the relief sought in the petition, and we therefore dismiss him as a party-respondent. We conclude that the Secretary of State is a proper party to this election dispute.

The only actions of Governor Pawlenty that are alleged in the petition are appointments to fill judicial vacancies. The authority, indeed the obligation, to make such appointments is provided in Article VI, § 8, of the Minnesota Constitution. Although petitioners argue that this appointment authority should be "strictly construed," the petition does not seek to bar the Governor from filling judicial vacancies in the future. Nor could it, because the petition is brought under section 204B.44, which provides a remedial process only for correction of the ballot and directly related election procedures. Moreover, the Governor cannot implement any of the relief that petitioners request: he is not responsible in any manner for preparation of the ballot.

█ The Secretary of State, in contrast, is the chief election official in the state. Among many other election-related duties, he is responsible for determining and communicating to all 87 county auditors which state and local offices will be on the ballot, Minn.Stat. § 204B.33(a) (2006); for certifying to the county auditors the names of the candidates who will be voted for at the primary election, Minn.Stat. § 204D.06 (2006); and for preparation of the example ballot, which includes the incumbent designation, Minn.Stat. § 204D.09, subd. 1 (2006). Moreover, if a provision of state election law cannot be implemented as a result of a court order, the Secretary of State has the authority and responsibility to "adopt alternative election procedures to permit the administration of any election affected by the order." Minn.Stat. § 204B.47 (2006). Although the Secretary of State correctly points out that he is not directly responsible for the printing and preparation of ballots, when, as here, a ballot challenge under Minn.Stat. § 204B.44 concerns an office for which voting is conducted statewide and for which the Secretary of State has provided the challenged ballot information to all 87 county auditors, we conclude that the Secretary of State is a proper party.

We therefore dismiss Governor Pawlenty as a party-respondent in this matter, but deny the request of Secretary of State Ritchie to be dismissed as a party-respondent.

## II.

█ The Governor and Secretary of State urge the court to deny the petition on grounds of laches. Laches is an equitable doctrine applied to "prevent one who has not been diligent in asserting a known right from recovering at the expense of one who has been prejudiced by the delay." *Winters v. Kiffmeyer,* 650 N.W.2d 167, 169 (Minn.2002). With respect to laches, " '[t]he practical question in each case is whether there has been such an unreasonable delay in asserting a known right, resulting in prejudice to others, as would make it inequitable to grant the relief prayed for.' " *Id.* at 170 (quoting *Fetsch v. Holm,* 236 Minn. 158, 163, 52 N.W.2d 113, 115 (1952)).

Our concern with the timing of ballot challenges is not a new one. More than 50 years ago we declined to consider the merits of a ballot challenge because "the petitioner ha[d] not proceeded with diligence and expedition in asserting his claim." *Marsh v. Holm,* 238 Minn. 25, 28, 55 N.W.2d 302, 304 (1952). We explained:

One who intends to question the form or contents of an official ballot to be used at state elections must realize that serious delays, complications, and inconvenience must follow any action he may take and that, unless a reasonable valid excuse be presented by him indicating why he did not act expeditiously, he should not be permitted to complain. It is important that such persons move expeditiously so ballots can be printed and distributed according to the requirements of the law.

*Id.* at 28–29, 55 N.W.2d at 304. We noted similarly in *Peterson v. Stafford,* 490 N.W.2d 418 (Minn.1992), *cert. denied,* 507 U.S. 1033, 113 S.Ct. 1852, 123 L.Ed.2d 475 (1993):

The very nature of matters implicating election laws and proceedings routinely requires expeditious consideration and disposition by courts facing considerable time constraints imposed by the ballot preparation and distribution process. As a result, we have examined applications for relief not only on their merits, but also from the perspective of whether the applicant acted promptly in initiating proceedings.

*Id.* at 419 (citing *Mattson v. McKenna,* 301 Minn. 103, 222 N.W.2d 273 (1974)).

We examine first whether petitioners unreasonably delayed in filing this petition. Petitioners assert that Clark did not decide to run for Seat # 4 until July 15, the day she filed her affidavit of candidacy. Petitioners further assert that they did not obtain a sample ballot from Rice County until August 11 and, until they obtained a sample ballot, could not confirm that Justice Gildea's name would appear on the ballot or that she would be designated as the incumbent. Petitioners then argue that they "were hopeful" that the incumbent designation would have been changed.

Finally, petitioners assert they "do not know how they could have filed sooner."

Petitioners' first claim is that under the plain language of Article VI, § 8, of the Minnesota Constitution, the qualified person appointed by the governor to fill a judicial vacancy cannot run in the next general election to fill the same judicial seat "occurring more than one year after the appointment." Petitioners' standing to bring this claim was not dependent on Clark's candidacy, and therefore petitioners did not have to wait to bring it until after Clark filed for office on July 15. Nor did petitioners have to wait until the sample ballot became available to make this claim. Rather, the claim could have been made as soon as Justice Gildea filed her affidavit of candidacy for Seat # 4, which she did on July 1, 2008. Moreover, both Justice Gildea's and petitioner Clark's affidavits of candidacy identified the incumbent of the seat for which they were filing as Justice Gildea.

Petitioners' next claim is that if Justice Gildea's name remains on the ballot, Justice Gildea cannot be designated as the incumbent under Minn.Stat. § 204B.36, subd. 5. Petitioners did not have to wait until Clark filed for office or until the sample ballot became available to assert this claim, either. Rather, this claim also could have been made at least as soon as Justice Gildea filed her affidavit of candidacy on July 1, 2008. *See Peterson,* 490 N.W.2d at 419 ("The petitioner claims to have been unaware of the fact that the ballot form would include an incumbency designation until he received his absentee ballot in late August 1992; yet, that designation has appeared on every judicial election ballot on which a sitting judge has sought reelection since 1949.").

Finally, at the core of several of petitioners' claims is their argument that the "systemic" use of gubernatorial appointments

to fill judicial vacancies, followed by designation of the appointees as incumbents in the next election to fill the vacated seats, violates a state constitutional mandate to select judges by election rather than by appointment. The processes about which petitioners complain are not new. The incumbent designation has been required by law to be on the ballot in judicial races since 1949. *See* Act of Apr. 25, 1949, ch. 690, § 1, 1949 Minn. Laws 1237 (originally codified at Minn.Stat. § 205.82 ("[I]f a justice or judge is a candidate to succeed himself, the word 'incumbent' shall be printed after his name where it appears among the names of the candidates for the office.")). Based on an exhibit filed in support of the petition, Clark was exploring the issue of gubernatorial appointments to fill judicial vacancies as early as 2005. Aff. of Jill Clark—Amended, Ex. 6 (Letter from Office of Governor Pawlenty responding to an October 25, 2005 data request from petitioner Clark for "resignation, disability or leave of absence letters" from judges received in the past ten years and documents showing "whether any seat for which data was produced in response to the above requests was run in public election"). It is clear that petitioner Clark was aware of the issues she now asserts as a "systemic" violation of the Minnesota Constitution long before this petition was filed. A challenge to what petitioners describe as a "systemic" problem, dating back to the initial passage of the statute in 1949 providing for the incumbent designation, was not dependent on the availability of the sample ballot for this primary election.

Petitioners assert that their delay in bringing this action was reasonable because they "were hopeful" that the official ballot would be error-free. But petitioners knew when the legislature adjourned in May 2008 that the statutory requirement for incumbent designation in judicial races, in place since 1949, had not been amended. Moreover, in two previous cases we upheld the incumbent designation against equal-protection challenges. *Peterson,* 490 N.W.2d at 424; *Gustafson v. Holm,* 232 Minn. 118, 128, 44 N.W.2d 443, 448 (1950). Petitioner Clark acknowledged at oral argument that for petitioners' arguments to prevail, we must overrule *Gustafson* and *Peterson.* It is simply unreasonable to have believed that state election officials, in the absence of any legislative action and in light of the court's precedent in *Peterson* and *Gustafson,* would have ignored the statutory requirement of incumbent designation.[4]

Balanced against petitioners' delay in raising these issues is the prejudice that would result to respondents, other election officials, other candidates, and the Minnesota electorate in general were we to grant the relief petitioners request.

The Rice County Auditor/Treasurer attests without contradiction that ballots for the primary election have already been printed; absentee ballots have already been sent to voters and some have been returned as ballots cast; and electronic voting machines have already been programmed, tested, and certified. Were we to require removal of Justice Gildea's name or the incumbent designation from the primary ballot, all paper ballots state-

---

4. Petitioners suggest that the decision of the United States Supreme Court in *Republican Party of Minnesota v. White,* 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), was a basis to anticipate the changes that petitioners advocate. The Court in *White* did not have before it and did not address either the issue of purely state constitutional law that is the basis for petitioners' claim that a person appointed to fill a judicial vacancy is ineligible to run in the next election to retain the seat or the issue of the validity of the incumbent designation required by Minn.Stat. § 204B.36, subd. 5.

wide would have to be either altered by hand or reprinted; all electronic voting machines would have to be reprogrammed, retested,[5] and recertified; new absentee ballots would have to be sent, even to those who had already cast a ballot; and those who cast an early absentee ballot in person would have to be given the right to cast a ballot anew.

It is undisputed that all of these actions cannot be accomplished in the days remaining before the primary election on September 9 and still comply with state-law deadlines. For example, under Minn. Stat. § 204B.35, subd. 4 (2006), absentee ballots are to be available 30 days before the election; with respect to the September 9 primary, that was on Friday, August 8. Under Minn.Stat. § 204D.09, subd. 2 (2006), a sample ballot is to be available for public inspection at least two weeks before the state primary; in this case, that was on Tuesday, August 26. Even had we granted the petition, in whole or in part, immediately after oral argument, the counties could not have complied with these statutory deadlines.

There are also federal election laws to be complied with. The Director of Elections in the Office of the Secretary of State attests that in order to comply with the federal Help America Vote Act of 2002, 42 U.S.C. §§ 15301–545 (Supp. IV 2004), each of the more than 3,000 polling places in Minnesota must be equipped with a voting machine capable of assisting persons with disabilities to vote. *See* Minn.Stat. § 204B.18, subd. 1 (2006). These machines have video and audio ballot displays, both of which would have to be reprogrammed to accommodate removal of either Justice Gildea's name or the incumbent designation from the ballot.

Furthermore, because of the nature of the issues raised by petitioners, it is likely that modification of the ballot would not be limited to the race for Seat # 4. Were we to accept petitioners' argument that under the Minnesota Constitution a judge appointed to fill a judicial vacancy is not eligible to run for that office in the next election, the ruling would apply to all other judicial candidates in the same circumstance, affecting numerous races. Likewise, elimination of the incumbent designation for a judge running for the first time for an office to which he or she was initially appointed would necessarily affect not just this race, but also the races of all similarly situated district court, court of appeals, and supreme court judges or justices seeking election. This would significantly increase the number of changes needed on both paper and electronic ballots in the short time remaining until the primary, multiplying both the costs to election officials of implementing any ordered changes and the likelihood of errors occurring in the preparation of revised ballots on an accelerated basis.

In addition to the impossibility of complying with statutory election deadlines, the pragmatic problems of revising primary election ballots at this late date facing the Secretary of State and the 87 county auditors, and the costs associated with such revisions, there would be prejudice to Justice Gildea and any similarly situated judicial candidates whose names might be stricken from the ballot. Were we to grant the petition and strike Justice Gildea's name from the primary ballot, she would be denied the right to run for an office for which she has already expended time, energy, and resources to file for can-

---

**5.** The Rice County Auditor/Treasurer attests that it would take a minimum of seven days to reprogram the county's electronic voting ma-chines and an additional week to retest the machines.

didacy, form a campaign committee, prepare and print election materials, and mount an election campaign—and for which she asserts that she has a constitutional right to run. Moreover, because petitioners waited until after the period for filing for elective office closed to bring their ballot challenge, Justice Gildea would be denied the opportunity to run for another elective office in the state until the 2010 election.

And we cannot ignore the potential prejudice to the electorate in general. Requiring changes to the primary ballot at this stage could prejudice those who have requested, or perhaps already cast, absentee ballots. The risk of creating additional error in the ballot or problems with voting machines, perhaps wholly unrelated to the judicial race at issue, by mandating last-minute changes cannot be overlooked.

In some past cases we have considered ballot challenges on their merits, despite the untimeliness with which they were brought. *See, e.g., Winters,* 650 N.W.2d at 169–74 (determining when a gubernatorial judicial appointment is made for purposes of Article VI, § 8, despite the fact that the ballot challenge was not filed until July 10). Nevertheless, we have not followed that practice uniformly, and it is not precedential.

■ In this case, in the absence of the relief requested, petitioner Clark has not been barred from the primary ballot and petitioner Robins will not be barred from voting for her (or any other candidate on the primary ballot). Given petitioners' unreasonable delay in asserting the interpretations of the constitution and election statutes that they espouse here, and balanced against the significant potential prejudice to respondents, to other election officials, to Justice Gildea and potentially to other candidates, and to the electorate, we conclude that it would be inequitable to

grant the relief sought by petitioners with respect to the primary ballot even if we were to conclude that their arguments had merit. Accordingly, we deny the petition on grounds of laches with respect to the primary ballot.

■■ Petitioners seek the same relief with respect to the general election ballot. The deadlines, legal and practical, that give rise to prejudice regarding the primary election are not yet upon us for the general election. We could require petitioners to wait until the results of the primary are known before asserting their general-election challenge, but even if the petition were then renewed expeditiously, the parties and the court would again be required to address the issues on an expedited basis to avoid the problems now at hand for the primary election. Moreover, our case-by-case practice of addressing the merits of ballot challenges even in the face of a valid laches argument recognizes the importance of providing clarity and certainty in the election process. *See, e.g., Winters,* 650 N.W.2d at 170. Therefore, in the interest of judicial economy and to remove uncertainty from the election process, we turn to the merits of petitioners' claims as applied to the general election ballot.

### III.

Petitioners contend that Article VI, § 8, of the Minnesota Constitution bars Justice Gildea from the ballot entirely. Article VI, § 8, provides:

Whenever there is a vacancy in the office of judge the governor shall appoint in the manner provided by law a qualified person to fill the vacancy until a successor is elected and qualified. The successor shall be elected for a six year term at the next general election

occurring more than one year after the appointment.

According to petitioners, the governor's power to appoint persons to fill judicial vacancies "should be strictly construed, so as to give power to the overall concept of the Minnesota Constitution, and its specific provisions requiring judicial selection by election." Petitioners argue that Section 8 gives the governor the power to fill a judicial vacancy only until a successor is elected. Furthermore, petitioners argue that a dictionary definition of "successor"—"to come next in time or succession; follow after another; replace another in an office or a position"—means the "successor" who is elected at the next general election must be a different person from the one "appoint[ed] . . . to fill the vacancy." Amended Petition at 26 (citing *The American Heritage Dictionary of the English Language* (4th ed.)) (emphasis omitted).

When examining constitutional provisions, our task is "to give effect to the clear, explicit, unambiguous and ordinary meaning of the language." *Rice v. Connolly,* 488 N.W.2d 241, 247 (Minn.1992). Unambiguous words need no interpretation. *State ex rel. Putnam v. Holm,* 172 Minn. 162, 166, 215 N.W. 200, 202 (1927). Therefore, we first consider whether Article VI, § 8, is ambiguous.

Article VI, § 8, allows the governor to fill a judicial vacancy by appointment "until a successor is elected and qualified." Petitioners argue that "successor" is necessarily limited to a person other than the person appointed to fill the vacancy. Respondents counter that "successor" need not exclude the person holding the job: that one can be one's own "successor." It seems equally plausible, as a third alternative, that the phrase "until a successor is elected and qualified" means the "successor" to the judge whose departure created

the vacancy in the first place, not to the judge appointed to fill the vacancy.

Because we deem Article VI, § 8, to be ambiguous, we look beyond the plain language of the provision for other indicia of the people's intent in ratifying it. *Kahn v. Griffin,* 701 N.W.2d 815, 825 (Minn. 2005). Whenever reasonably possible, we resolve ambiguity in the state constitution in a way that advances the apparent purpose for which the provision was adopted. *Id.*

The constitution need not have authorized the governor to fill judicial vacancies by appointment; it could instead have required such vacancies to be filled only by election, either by a special election called for that purpose or at the next general election. That the constitution requires the governor to fill judicial vacancies by appointment indicates the purpose of such a requirement: to enable the vital work of the courts to continue with as little disruption as possible. We therefore aim to resolve the ambiguity in the meaning of "successor" in a way that advances this purpose.

The rules applicable to the construction of statutes are equally applicable to the constitution. *State ex rel. Mathews v. Houndersheldt,* 151 Minn. 167, 170, 186 N.W. 234, 236 (1922). We consider a statute's legislative history to determine how its language should be construed. *Baker v. Ploetz,* 616 N.W.2d 263, 269 (Minn.2000). We therefore review the history of the constitutional provision requiring that judicial vacancies be filled by appointment to determine how the term "successor" should be construed.

As originally ratified, the constitution provided as follows:

In case the office of any judge shall become vacant before the expiration of

the regular term for which he was elected, the vacancy shall be filled by appointment by the governor until a successor is elected and qualified. And such successor shall be elected at the first annual election that occurs more than thirty days after the vacancy shall have happened.

Minn. Const. of 1857, art. VI, § 10. In other words, under the constitution as originally ratified, an appointed judge could serve as little as 31 days before the seat to which he was appointed appeared on the ballot.

In 1956, Article VI, § 10, was amended to provide that after an appointment to fill a judicial vacancy, the "successor shall be elected for a six year term at the next general election occurring more than one year after such appointment," the language that continues to apply today. *See* Minn. Const. art. VI, § 8. Thus, under the current language of the provision, an appointed judge will serve at least one year before the seat to which he or she was appointed appears on the ballot.

Petitioners contend that a judge who is appointed by the governor to fill a vacancy is constitutionally barred from seeking election to the same position. Yet in *State ex rel. Hennepin County Bar Association v. Amdahl*, we noted that "[t]hroughout the discussions and advocacies for adoption of the amendment, the people and bar were informed that if the amendment were adopted any judge appointed to fill a vacancy would not have to run for election until more than one year after the appointment." 264 Minn. 350, 359, 119 N.W.2d 169, 175 (1962). Petitioners have provided us with nothing to indicate that in adopting either the 1857 constitution or the 1956 amendment, the people of Minnesota understood that they were barring qualified, appointed judges from running for election to retain their office.

In statutory construction, we interpret statutory provisions in light of each other in order to avoid conflicting interpretations. *Am. Family Ins. Group v. Schroedl,* 616 N.W.2d 273, 277 (2000). Applying this principle to constitutional provisions, we look for other provisions in the Minnesota Constitution that use the term "successor." There are several.

Article V, § 2, prescribes the term of office for the governor and lieutenant governor as "four years and until a successor is chosen and qualified." Similarly, under Article V, § 4, the terms of office of the other constitutional officers—secretary of state, attorney general, and state auditor—are also "four years and until a successor is chosen and qualified." Even within the realm of vacancies, under Article V, § 5, if there is a vacancy in the office of governor, the lieutenant governor "shall be governor during such vacancy." Under Article V, § 3, the governor is to

fill any vacancy that may occur in the offices of secretary of state, auditor, attorney general and the other state and district offices hereafter created by law until the end of the term for which the person who had vacated the office was elected or the first Monday in January following the next general election, whichever is sooner, and until a successor is chosen and qualified.

If petitioners are correct that a "successor" must be "someone else," then all Minnesota constitutional officers, including the governor, lieutenant governor, secretary of state, attorney general, and state auditor, are constitutionally limited to single four-year terms, because each may constitutionally serve only "until a successor"—that is, someone else—"is chosen and qualified." Similarly, if a "vacancy-filler" (to use petitioners' term) is constitutionally barred from running for election

to the same position, then a lieutenant governor who fills a gubernatorial vacancy is constitutionally ineligible to run for election as governor. Finally, if a "successor" must be "someone else," then anyone appointed by the governor—to fill not just a judicial vacancy, but to fill any vacancy statewide—is constitutionally ineligible to run for the same position in the next election, because he or she may serve only "until a successor is elected and qualified."

To rule for petitioners and also avoid these results, which we find unreasonable and unsupportable, we would have to interpret "successor" differently, depending on which section of the Minnesota Constitution is at issue. That would create conflicting interpretations of the same word—"successor"—when used in the same context, that is, filling vacancies pending an election. We decline to create such a conflict.

■ Finally, as we have observed, "[a] practical construction of the constitution, which has been adopted and followed in good faith by the legislature and people for many years, is always entitled to receive great consideration from the courts." *City of Faribault v. Misener*, 20 Minn. 396, 401 (Gil.347, 352) (1874). We therefore review how this constitutional provision has been implemented by the legislature.

In 1949, the legislature required that judicial seats be designated on the ballot by the name of the incumbent and whether that individual had been appointed or elected to the office. *See* Act of Apr. 25, 1949, ch. 690, § 1, 1949 Minn. Laws 1237 (codified at Minn.Stat. § 205.82). The 1949 version of the statute stated: "if a justice or judge is a candidate *to succeed himself,* the word 'incumbent' shall be printed after his name where it appears among the names of the candidates for the office." (Emphasis added.) The provision was renumbered as Minn.Stat. § 204B.36,

subd. 5, in 1981 as part of the recodification of election laws. *See* Act of Apr. 14, 1981, ch. 29, art. 4, § 36, 1981 Minn. Laws 38, 93. As reenacted, the provision stated: "If a chief justice, associate justice, or judge is a candidate *to succeed himself,* the word 'incumbent' shall be printed after his name as a candidate." (Emphasis added.) The provision was amended to its current form in 1986 as part of the general removal of gender-specific references from the statutes. *See* Act of Mar. 25, 1986, ch. 444, § 1, 1986 Minn. Laws 775, 776; *see also* Table VI to the 1986 Minnesota Statutes (listing section 204B.36 as one affected by the gender-reference changes). As amended, the phrase "succeed himself" was replaced by the phrase "succeed again."

This legislative history indicates that, at least for the past 59 years, the legislature has understood that the current officeholder may be "a candidate to succeed himself," whether initially appointed to the position or elected. In addition, nothing in Minnesota Statutes chapter 204B appears to bar one initially appointed to fill a judicial vacancy from filing for election to the same office. Minnesota Statutes § 204B.06, subd. 8 (2006), requires a candidate for judicial office to "submit with the affidavit of candidacy proof that the candidate is licensed to practice law in this state." If the legislature understood that a judge appointed to fill a vacancy is constitutionally barred from seeking election to the same position, the legislature could easily have required judicial candidates to certify that they were not initially appointed to the position.

We have also previously suggested that the term "successor" in Article VI, § 8, and its forerunners does not exclude the current officeholder. In 1875, we interpreted the term "successor" in Article VI, § 10 (the forerunner of the modern Article

VI, § 8), to mean "the successor whose election is made necessary by the vacancy." *State ex rel. Babcock v. Black,* 22 Minn. 336, 339 (1875). Similarly, in *Enger v. Holm,* we observed that a judge could be "his own successor." 213 Minn. 154, 156, 6 N.W.2d 101, 102 (1942).

We think that petitioners' dictionary definition of "successor" is an unreasonably constrained interpretation for purposes of these constitutional provisions, contrary as it is to 150 years of this state's history.[6] Had the people of Minnesota intended appointed officials at any level to be ineligible to run for the same office, they could have stated so explicitly, as the Michigan Constitution for a brief time provided:

> A vacancy in the elective office of a judge of any court of record shall be filled at a general or special election as provided by law. The supreme court may authorize persons who have served as judges and who have retired, to perform judicial duties for the limited period of time from the occurrence of the vacancy until the successor is elected and qualified. *Such persons shall be ineligible for election to fill the vacancy.*

Mich. Const. art. 6, § 23 (1963) (emphasis added), *quoted in Kelley v. Riley,* 417 Mich. 119, 332 N.W.2d 353, 354 (1983).[7] The people of Minnesota have not done so. We will not read into the Minnesota Con-

stitution the limitation that petitioners urge.

We therefore hold that Article VI, § 8, of the Minnesota Constitution does not bar Justice Gildea from seeking election to the judicial office to which she was appointed.

## IV.

Because we do not rule Justice Gildea ineligible to appear on the general election ballot, we address petitioners' alternative claim that Justice Gildea should not be designated as the "incumbent" on the ballot as provided by Minn.Stat. § 204B.36, subd. 5 (2006). Section 204B.36, subd. 5, provides: "If a chief justice, associate justice, or judge is a candidate to succeed again, the word 'incumbent' shall be printed after that judge's name as a candidate." Petitioners make several arguments in support of striking the incumbent designation, including arguments based on state statutes, the state constitution, and finally, the First Amendment. We address these arguments in turn.

Petitioners' first argument is based on their interpretation of the language of section 204B.36, subd. 5, which applies the incumbent designation to "a candidate to succeed again." Petitioners assert that Justice Gildea is not a candi-

---

6. We note as well that Amendment XX, § 1, of the United States Constitution appears to use the term "successor" in a manner contrary to the narrow interpretation advocated by petitioners. Amendment XX, § 1 provides:

    The terms of the President and Vice President shall end at noon on the 20th day of January, and the terms of Senators and Representatives at noon on the 3rd day of January, of the years in which such terms would have ended if this article had not been ratified; *and the terms of their successors shall then begin.*

    (Emphasis added.) Under petitioners' "someone else" interpretation of "successor," this

provision would preclude the President, the Vice President, and all members of Congress from serving more than one term.

7. Five years later, the Michigan Constitution was amended to reinstate the governor's ability to fill judicial vacancies by appointment. The 1963 provision " 'embarrassed the operation of government by leaving important judicial offices without their own regular incumbent for long periods of time.' " *Kelley,* 332 N.W.2d at 355 (quoting *Schwartz v. Secretary of State,* 393 Mich. 42, 222 N.W.2d 517, 520 (1974)).

date to "succeed again." They argue that if we have allowed Justice Gildea to remain on the ballot, we necessarily have limited the meaning of "successor" to a person who succeeds in the next election, and therefore, in order to be a candidate to succeed *again*, as used in section 204B.36, subd. 5, the candidate must have been elected previously. Petitioners conclude that a person appointed, but not yet elected, is not a candidate to "succeed again" and is therefore not an incumbent for purposes of section 204B.36, subd. 5.

Respondents Pawlenty and Ritchie contend that Justice Gildea succeeded Justice Russell A. Anderson as associate justice, and the fact that Justice Gildea was appointed to the office, rather than elected, does not change the fact that she is Justice Anderson's successor. Therefore, according to respondents, Justice Gildea is "a candidate to succeed again" and qualifies for the incumbent designation.

Petitioners cite no authority that limits the meaning of successor to one who was previously elected. Rather, they apparently argue that such a limited meaning necessarily follows from a decision not to remove Justice Gildea from the ballot. We fail to see any law or logic that compels such a result. Furthermore, we perceive no sound reason why Justice Gildea cannot be viewed as the successor to Justice Anderson in Seat # 4. There is no reason, therefore, that she cannot be a candidate to "succeed again," entitled to the incumbent designation under section 204B.36, subd. 5.

■ Our decision to reject petitioners' incorrect interpretation of the "succeed again" language is buttressed by the fact that as the statute was initially enacted in 1949 and reenacted in 1981, the incumbent designation applied to "a candidate to succeed himself." See p. 20, *supra*. The phrase "succeed again," which is the key to petitioners' linguistic argument, was substituted for the phrase "succeed himself" as part of the general removal of gender-specific references from the Minnesota Statutes enacted by the legislature in 1986. *See* Act of Mar. 25, 1986, ch. 444, § 1, 1986 Minn. Laws 775, 776; *see also* Table VI to the 1986 Minnesota Statutes (listing section 204B.36 as one affected by the gender reference changes). Because the removal of gender-specific language did not change the substantive meaning of the affected statutes, Act of Mar. 25, 1986, ch. 444, § 3, 1986 Minn. Laws at 776, we conclude that "succeed again" was intended to be only a gender-neutral version of "succeed himself" and was not intended to connote a limitation on the method of attaining office needed to qualify for the incumbent designation.

Finally, the statute provides for designation of a candidate as the incumbent. The dictionary definitions of "incumbent" include "[a] person who holds an office" and "[c]urrently holding a specified office." *The American Heritage Dictionary of the English Language* 889 (4th ed. Houghton Mifflin 2000). Nothing in the common usage of the term incumbent limits its application to those who have been elected, rather than appointed, to the position.

■ For all these reasons, we reject petitioners' argument that judicial candidates do not qualify for the incumbent designation provided for in section 204B.36, subd. 5, unless they have previously been elected to judicial office. Accordingly, as holder of Seat # 4, Justice Gildea qualifies for the incumbent designation as provided by the statute even though she was initially appointed to the judicial office for which she is now running.

■ Petitioners make a second statutory argument for striking the incumbent

designation, contending that the incumbent designation conveys an advantage to the candidate that is prohibited by Minn.Stat. § 204B.35, subd. 2 (2006). Section 204B.35, subd. 2, provides: "The name of a candidate shall not appear on a ballot in any way that gives the candidate an advantage over an opponent, including words descriptive of the candidate's occupation, qualifications, principles, or opinions, except as otherwise provided by law."

The fatal flaw in this argument that the incumbent designation is prohibited by section 204B.35, subd. 2, is that subdivision 2 expressly allows for statutory exceptions to its prohibition. Subdivision 2 prohibits a ballot identification that provides an advantage "except as otherwise provided by law." The incumbent designation is "provided by law," specifically section 204B.36, subd. 5. Therefore, even acknowledging petitioners' contention that the incumbent designation gives an advantage—a contention completely unsupported by competent evidence—the designation is a permissible statutory exception to the general prohibition contained in section 204B.35, subd. 2.

In addition to these statutory arguments, petitioners claim that the incumbent designation required by section 204B.36, subd. 5, offends the Minnesota Constitution. They argue that the incumbent designation violates the state constitution both on its face and as applied to a judge not previously elected, because it infringes the voters' right to select judges by election. Specifically, petitioners contend that the incumbent designation is contrary to the state constitution because it "almost insur[es] that the gubernatorial vacancy-appointee will win the next election." Thus, this challenge is based on the asserted advantage provided to an incumbent by that designation on the ballot.

■ Petitioner's arguments are deficient in both factual and legal support.

Factually, petitioners have not adequately established that the incumbent designation confers the significant advantage on which the claim is premised. Petitioners rely on the affidavit of petitioner Robins. She attests that it is her "view that the word 'incumbent' gives any candidate, including a judicial candidate, a distinct advantage over an opponent." Robins states that this view is based on her experience in running for Rice County Commissioner (a race in which the incumbent label is not used) and on talking with voters, but provides no specific factual information on which her view is based. Petitioner Robins is not presented as an expert in these matters. This affidavit is inadequate to establish as a fact the existence of an advantage based on the incumbent designation.

■ Petitioners also rely on William James Scott, Jr., Note, *California Ballot Position Statutes: An Unconstitutional Advantage to Incumbents*, 45 So. Cal. L.Rev. 365, 366 (1972), which notes that "[p]revious studies of ballot position have yielded almost unanimous results: all other factors being equal, the name appearing first in a list of candidates attracts a larger than random share of the vote." Even if Scott's characterization of those studies is accurate, they do not support the proposition that petitioners advance here, namely, that the incumbent label itself—as opposed to ballot position—attracts a disproportionate share of the vote. In addition, Scott himself studied only California races in which there was no incumbent on the ballot.

Petitioners also cite *Clough v. Guzzi*, 416 F.Supp. 1057 (D.Mass.1976), as providing support for their factual assertion of an advantage created by the incumbent designation. *Clough* involved the combination of first ballot position and incumbent labeling. *Id.* at 1059. Nevertheless, the federal district court found—on the basis of

conflicting expert testimony—that "the designation of incumbency does confer a distinct benefit on the incumbent candidate." *Id.* at 1065. But in concluding that the advantage conferred was not unconstitutional, the court also noted that the "advantage remains problematic and variable from election to election." *Id.* at 1068.

Thus, the underpinning of petitioners' premise that the incumbent designation provides a significant advantage that "almost insur[es] that the gubernatorial vacancy-appointee will win the next election" is weak, at best. We reject petitioners' purported factual premise.

Legal support for petitioners' claim that the designation of incumbents violates the Minnesota Constitution is even weaker. Indeed, petitioners cite no authority that directly supports their claim.

On the other hand, we have twice rejected challenges to the judicial incumbent-designation statute. *Peterson v. Stafford*, 490 N.W.2d 418 (Minn.1992), *cert. denied*, 507 U.S. 1033, 113 S.Ct. 1852, 123 L.Ed.2d 475 (1993); *Gustafson v. Holm*, 232 Minn. 118, 44 N.W.2d 443 (1950). In both cases we held that the incumbent designation served the permissible purpose of informing the voters. *See Gustafson*, 232 Minn. at 126, 44 N.W.2d at 447 (observing that "[u]se of the word 'incumbent' following the candidate's name simply informs the voter of the person who presently holds the position"); *Peterson*, 490 N.W.2d at 424 (noting that "the continued use of the term 'incumbent' to denote the person who presently holds the office for purposes of informing the voter is no less valid today than it was in 1950").

Because *Gustafson* and *Peterson* were essentially equal-protection challenges, *see Peterson*, 490 N.W.2d at 423–24 (describing the question presented as "whether the distinctive legislative treatment given judicial ballots survives equal protection scrutiny" and describing the *Gustafson* decision as reflecting "all of the ingredients" of a "modern rational-basis test"), they do not directly control the issue presented here. Nevertheless, our analysis in *Peterson* is particularly germane to petitioners' state constitutional claim. Before addressing the equal-protection issue in *Peterson*, we traced the constitutional history of the Minnesota provisions for judicial election and appointment. We explained:

> While this state has opted for the election of judges and has declined to adopt a Missouri-type retention plan, it has provided its own variation of the election process. Section 10 of the original judiciary article provided for the filling of judicial vacancy not by special election, but by appointment of the governor with an election to follow at the next annual election occurring more than 30 days after the vacancy. In 1972, this provision was amended to provide that an election to succeed the appointee be held "at the next general election occurring more than one year after the appointment." It appears the extension of the time before an election for the office was, in the words of the 1972 subcommittee, "to allow the public to reflect favorably or unfavorably on a judge's competence in office," while, at the same time, "retaining ultimate control of the judiciary in the hands of the voting public." To achieve this purpose, it appears that the legislature considered it appropriate for the ballot to inform the voters which candidate was seeking retention.

*Peterson*, 490 N.W.2d at 423 (footnote omitted) (quoting the Judicial Branch Committee Report, Minnesota Constitutional Study Commission (1972)). We noted that this history "supports the legislative prerogative of distinguishing judicial elections in manner and form from those

legislative and executive elections conducted in the traditional partisan sense." *Id.* We summed up:

> It seems clear that Minnesota has adopted its own middle-of-the-road approach to judicial selection. The open election process has been retained, but with a quasi-retention feature which simply informs the voter who the incumbent candidate is and who the challenger is. This arrangement acts as a check on the gubernatorial appointment process by keeping the ultimate choice with the voters while, at the same time, recognizing the unique independent nature of the judicial function. *This approach is authorized by our constitution* as it has developed over the years. . . .

*Id.* at 425 (emphasis added). Our conclusion in *Peterson* that "[t]his approach is authorized by our constitution" directly contradicts petitioners' state constitutional claim in this case. Moreover, our interpretation has given effect to both gubernatorial appointments and popular elections as provided in Article VI, §§ 7 and 8, of the Minnesota Constitution. Petitioners have provided no sound basis on which we should revisit, much less reject, this conclusion.[8]

■■■ Petitioners' claim that the incumbent designation violates the state constitution lacks both factual and legal support. We therefore hold that the incumbent designation provided by Minn.Stat. § 204B.36, subd. 5, does not violate the Minnesota Constitution.

Petitioners' final claim is that the incumbent designation, either alone or in combination with the governor's initial appointment to fill a judicial vacancy,[9] violates petitioner Clark's rights as a candidate and petitioner Robins's rights as a voter, under the First Amendment to the United States Constitution. Petitioners assert that Clark's right to be considered as a candidate and their rights as voters to a broad spectrum of judicial candidates are burdened because "governors have systematically appointed vacancy-fillers to seats left by vacating judges, those appointees have been allowed to have 'incumbent' by their name, and they have overwhelmingly been 'retained' at election."

In assessing both First Amendment and equal-protection challenges to state laws that regulate elections, and the ballot in particular, the Supreme Court has employed a flexible approach in which the level of scrutiny is determined by the degree to which voters' rights are adversely affected by the challenged regulation. For example, in *Burdick v. Takushi*, 504 U.S. 428, 432, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), the Supreme Court rejected the notion that a law that imposes *any* burden on the right to vote must be subject to strict scrutiny. The Court reemphasized the "more flexible standard" adopted by the Court in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), and explained:

> Under this standard, the rigorousness of our inquiry into the propriety of a

---

**8.** Petitioners contend that *Peterson* "has been called into question by" the United States Supreme Court's opinion in *Republican Party of Minnesota v. White*, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002). The Court held in *White* that as long as Minnesota provides for the contested election of judges, it cannot limit campaign speech of judicial candidates in a manner inconsistent with the First Amendment. *Id.* at 788, 122 S.Ct. 2528.

The Court did not have before it this issue of state constitutional law.

**9.** Petitioners make no independent arguments in support of their First Amendment claim based solely on the incumbent designation. Rather, they simply refer the court to their arguments based on the combination of gubernatorial appointment and the incumbent designation.

state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subject to "severe" restrictions the regulation must be "narrowly drawn to advance a state interest of compelling importance." But when a State election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions.

*Burdick,* 504 U.S. at 434, 112 S.Ct. 2059 (citations omitted). Accordingly, in this context strict scrutiny is warranted only when constitutional rights are subject to severe restrictions.

■ The first step in addressing a First Amendment challenge to an election law regulating the ballot is therefore to "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment that the plaintiff seeks to vindicate." *Anderson,* 460 U.S. at 789, 103 S.Ct. 1564. The court must then "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* After weighing such factors as "the legitimacy and strength of each of those interests" and "the extent to which those interests make it necessary to burden the plaintiff's rights," the court is "in a position to decide whether the challenged provision is unconstitutional." *Id.*

■ We first consider "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson,* 460 U.S. at 789, 103 S.Ct. 1564. Petitioners argue that their rights are severely impaired, relying on their assertion that the incumbent designation unfairly advantages one candidate by creating uninformed windfall voting for the incumbent. We have already noted above the lack of factual foundation for petitioners' unfair-advantage argument.

But, hypothetically, even if the advantage exists, the asserted injury cannot be accurately characterized as severe. The case relied on by petitioners for the proposition that an incumbent at the top of the ballot benefits from uninformed or indifferent voting behavior, *Clough v. Guzzi,* is particularly instructive. *Clough* involved a challenge to a Massachusetts ballot system that gave incumbents both the first ballot position and an incumbent label on the ballot. 416 F.Supp. at 1059. The court found that "the designation of incumbency does confer a distinct benefit on the incumbent candidate." *Id.* at 1065. The court nevertheless concluded that advantage was not unconstitutional. *Id.* at 1068. The court concluded that the practice of designating the incumbent *and* listing her first on the ballot did not have a severe impact on protected rights. *Id.* at 1066–67. The court explained:

We first note what the challenged statutes do not do: they do not impose direct restrictions on the exercise of the right to vote; they do not effectively bar candidates from an election by imposing prohibitively burdensome candidacy filing fees; and they do not restrict the ballot to candidates of only certain political parties.

*Id.* at 1067 (citations omitted). The court therefore concluded that "even assuming some positional advantage here, the voters' right to choose their representatives is not sufficiently infringed as to warrant strict scrutiny." *Id.*

The incumbent designation challenged here is similarly not burdensome. It does not deny petitioner Clark, or any

candidate, access to the ballot. Moreover, under the rotation system required by Minn.Stat. § 204D.08, subd. 3 (2006), the names of each candidate, including petitioner Clark's, will appear in the first ballot position roughly an equal number of times. Finally, the incumbent designation does not prevent petitioner Robins from voting for petitioner Clark or any other candidate of her choosing. Compared to ballot restrictions that other courts have found to significantly burden First Amendment rights, the incumbent-designation statute imposes at most a de minimis burden on judicial candidates and voters. *See Bullock v. Carter*, 405 U.S. 134, 139, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (striking down a filing fee required of candidates in party primary elections that imposed "a particularly heavy burden on candidates for local office"); *Anderson*, 460 U.S. at 792, 794, 103 S.Ct. 1564 (striking down Ohio's early filing deadline for independent Presidential candidates because it "totally exclude[d] any candidate who makes the decision to run for President as an independent" after the deadline and "discriminates against those candidates and—of particular importance—against those voters whose political preferences lie outside the existing political parties"). Like the court in *Clough*, we conclude that the incumbent designation does not sufficiently interfere with candidates' or voters' rights to warrant strict scrutiny.

Petitioners argue only that the combination of gubernatorial appointments and incumbent designation that they challenge fails if subjected to strict scrutiny. Thus, they implicitly concede that if a lower standard of review applies, their challenge must be rejected. Because we conclude strict scrutiny does not apply here, no further analysis is required to reject petitioners' First Amendment claim. Nevertheless, we will take the next step of iden-

tifying and evaluating the interests put forward by the state. *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564.

In *Clough*, the state justified its method of ballot ordering and labeling as an informational device, to indicate the candidate for re-election both by marking his or her name and by placing that name first on the ballot. 416 F.Supp. at 1068. The court found the designation of the incumbent "material" to the electoral decision-making process. *Id.* On that basis, the court concluded that "[t]he fact that some statistical advantage may at the same time accrue to one of the candidates by virtue of his or her incumbency does not for constitutional purposes invalidate that otherwise legitimate purpose, especially where that advantage remains problematic and variable from election to election." *Id.*

The reasoning of the federal district court in *Clough* is similar to our reasoning in *Gustafson* and *Peterson*. In *Gustafson*, we observed that "[u]se of the word 'incumbent' following the candidate's name simply informs the voter of the person who presently holds the position." 232 Minn. at 126, 44 N.W.2d at 447; *see Peterson*, 490 N.W.2d at 424 (noting that "the continued use of the term 'incumbent' to denote the person who presently holds the office for purposes of informing the voter is no less valid today than it was in 1950"). In both cases we concluded that the purpose to inform voters satisfied rational-basis review.

■ Although *Clough*, *Gustafson*, and *Peterson* were equal-protection cases, the analysis and conclusions reached by applying the *Anderson* approach under the First Amendment are similar. *See Clements v. Fashing*, 457 U.S. 957, 971, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (addressing a First Amendment challenge to Texas restrictions on candidacy and concluding

**314**

that analysis under the Equal Protection Clause "disposes of this argument" as well). As discussed above, the effect of the challenged provisions on the asserted candidate and voter rights is no more than de minimis and does not warrant strict scrutiny. The purpose of the incumbent designation—to inform the voters—is sufficient to justify the minimal intrusion, if any, on petitioners' First Amendment rights. We conclude that petitioners have not established any violation of their First Amendment rights.

Petition denied.